IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 1:16-cv-01745-LTB-KMT

ROBYN MONDRAGON (f.k.a. ROBYN DURAN),

    Plaintiff,

v.

ADAMS COUNTY SCHOOL DISTRICT NO. 14,
ADAMS COUNTY SCHOOL DISTRICT NO. 14 BOARD OF EDUCATION,
PATRICK SANCHEZ, individually and in his official capacity,
KANDY STEEL, individually and her official capacity,
WALTER KRAMARZ, individually and in his official capacity,
JAMES DURAN, individually and in his official capacity, and
CHERRY CREEK SCHOOL DISTRICT NO. 5,

    Defendants.

---

# ORDER

---

This employment discrimination case is before me on (1) Defendant Patrick Sanchez's motions to dismiss the complaint and amended complaint (ECF Nos. 37, 70); (2) Defendants Adams County School District No. 14 (the "District"), Adams County School District No. 14 Board of Education (the "Board"), and Walter Kramarz's (collectively, "Adams") motion to dismiss the amended complaint; and (3) Plaintiff Robyn Mondragon's motion for default judgment against defendant James Duran. (Mot. Default Judgment, ECF No. 17.)

In light of amended complaint, I DENY as moot Mr. Sanchez's motion to dismiss the initial complaint. (Sanchez's Mot. Dismiss, ECF No. 37). For the reasons described below, I GRANT IN PART and DENY IN PART Mr. Sanchez's

motion to dismiss the amended complaint (Sanchez's Mot. Dismiss, ECF No. 70.), and I GRANT IN PART and DENY IN PART Adams's Motion to Dismiss Amended Complaint (Adams's Mot. Dismiss, ECF No. 71.)  Because the clerk has not entered default as to Mr. Duran, I DENY WITHOUT PREJUDICE Dr. Mondragon's Motions for Default Judgment against Defendant James Duran.  (Mot. Default Judgment, ECF No. 17.)

## I.  BACKGROUND

Unless otherwise noted, the allegations described below are taken from Dr. Mondragon's amended complaint.  (Am. Compl., ECF No. 64.)

Adams County School District No. 14 is a public school district in Colorado, governed by its Board of Education.  Roughly 83% of the District's students are Hispanic.  In March 2010, the United States Department of Education, Office for Civil Rights ("OCR") launched an investigation into discriminatory and retaliatory education and employment practices by the Board and the District. (OCR Report, ECF No. 47-1.)  In 2012, the District removed its former superintendent and hired Mr. Sanchez.  (*Id.* at 3.)

In April 2014, the OCR issued a report concluding that the Board and District engaged in discriminatory education and employment practices targeted at Hispanic and Spanish-speaking students and staff from 2008-12.  (*Id.* at 2.)  The OCR report concluded "that District administration targeted the use of Spanish by students and staff for criticism, discipline, unfair treatment, and 'eradication' regardless of the circumstances, situations or venue."  (*Id.* at 6.)  For instance, a teacher "told students they could go back to Mexico" and was not punished.  (*Id.* at

8-9.)  A principal made "derogatory comments about Hispanic students and parents regarding their cultural differences and poverty," including once telling a staff member to "not worry about Hispanic students making messes in the bathrooms because Mexicans are poor, that Mexicans didn't use toilet paper, there were few restrooms in Mexico and Mexican children did not know how to use a restroom." (*Id.* at 9.)  The District involuntarily moved Hispanic staff to "unfamiliar grades and subject areas in an effort to increase teachers' personal prep time, workloads [sic] to set teachers up for failure, and ultimately intimidate teachers to leave." (*Id.* at 11.) The OCR report's conclusions were widely reported in the media.

The District and Mr. Sanchez agreed to voluntarily resolve the violations described in the OCR report.  Relevant to this case, the District agreed to "[p]romptly investigate all incidents of harassment on the basis of race, color, or national origin," hire a new grievance officer, create a central database to track complaints of discrimination, renew its anti-discrimination and anti-harassment policies, and prohibit retaliation against persons who report alleged harassment or participate in related proceedings.

The District recruited Dr. Mondragon, an expert in equity in education who worked at Cherry Creek School District in Colorado, to rectify the illegal practices and restore the District's reputation in the community.  Dr. Mondragon started working with the District in July 2014, and in January 2015, was promoted to Chief Equity and Communications Officer.  Her work had an immediate and positive effect on the district.

One of Dr. Mondragon's duties was to investigate discrimination and retaliation complaints from staff, parents, and students.  In November 2014, the Board received 21 letters complaining of discrimination at Rose Elementary School based on Hispanic/Latino race or speaking Spanish.  Dr. Mondragon conducted an extensive investigation into the complaints, interviewing witnesses and reviewing relevant documents.  After her two-month investigation, Dr. Mondragon concluded that administrators at Rose Elementary had created an atmosphere of distrust and implemented disproportionate measures against certain parents.  Dr. Mondragon reported her findings and recommendations to remedy the situation in a January 30, 2015 report.

Mr. Sanchez, who was having an extramarital affair with the principal of Rose Elementary, balked at the report's conclusions.  At a meeting held on February, 6, 2015, he asked Dr. Mondragon to change her conclusions, a request Dr. Mondragon found not just inappropriate but a violation of the OCR agreement.  She refused.  Undeterred, Mr. Sanchez inappropriately accessed Dr. Mondragon's computer to make changes to her final report.

Mr. Sanchez then launched an investigation into Dr. Mondragon without her knowledge.  Around March 9, 2015, Mr. Sanchez stripped her of her investigatory duties, cutting off an investigation into a discrimination complaint filed by a Hispanic teacher.  Later that month, the deputy superintendent, Kandy Steel, physically confronted Dr. Mondragon and admonished her about her leadership style.  The next day, Mr. Sanchez, Ms. Steel, and Dr. Mondragon met and discussed

trust and loyalty interactions with women, a conversation that struck Dr. Mondragon as bizarre.

Mr. Sanchez's investigation of Dr. Mondragon included repeated communications with James Duran, Dr. Mondragon's estranged husband, beginning in March 2015. Mr. Duran, who is a family friend of Mr. Sanchez's, reported that Dr. Mondragon was having an affair with a District employee. This allegation was not true. However, according Mr. Duran, at some point Mr. Sanchez confirmed that the affair had been going on for some time and also said he had "tons of proof" regarding the affair. Mr. Sanchez also told Mr. Duran that Dr. Mondragon "had been engaged in various underhanded behavior and was probably going to be reprimanded very soon." Mr. Sanchez's communications about Dr. Mondragon's employment was a violation of the District's policies.

In late March, Mr. Duran and Mr. Sanchez met at a bar. According to the District, Mr. Duran invited Mr. Sanchez to meet; according to Mr. Duran, the meeting was coincidental. The next day, Mr. Sanchez put Dr. Mondragon on investigatory leave without any explanation.

On April 2, 2015, Dr. Mondragon formally complained of discrimination and retaliation to Jack Kronser, the Acting Chief Director of Human Resources at the District. Despite the OCR settlement agreement's requirement of prompt investigations into allegations of discrimination, the District never investigated Dr. Mondragon's complaint.

On April 6, 2015, Mr. Duran warned Dr. Mondragon that "all hell is going to break loose today for you.  I'm sorry for what I've done and what is coming."  That same day, Dr. Mondragon was called to a meeting with Mr. Kronser and his executive assistant, Yessica O'Conner, who took the notes during the meeting.  Mr. Kronser reported that "people" had said that Dr. Mondragon's meetings lacked focus and that she was trying to align people against Mr. Sanchez.  Mr. Kronser also questioned Dr. Mondragon's leadership, particularly as it pertained to "gender distrust."  Mr. Kronser also brought up Dr. Mondragon's conduct at a conference at Houston, where Dr. Mondragon drank to the point that she threw up in a bar's bathroom.  Mr. Kronser reported the allegation that Dr. Mondragon was having an affair with a District employee, and Dr. Mondragon refused to respond to that allegation.  Other topics at the meeting included allegations that Dr. Mondragon disparaged the effectiveness of Mr. Kramarz, the District's general counsel, and "attacked leadership" by suggesting that perhaps people questioned her leadership because she was a person of color.  Dr. Mondragon was given the opportunity to respond to the allegations at the meeting.

Given the deteriorating situation at the District, Dr. Mondragon considered starting her own business.  She contacted some friends who worked at Cherry Creek as high-level and cabinet employees.  One of her friends, Jennifer Perry, told her that a Cherry Creek principal was authorized to set aside funding for a contract involving equity work.  Ms. Perry and Dr. Mondragon met to discuss this possibility,

and Dr. Mondragon met with two other executive-level officials who expressed enthusiasm about the idea.

On May 8, 2015, while she was still in talks with Cherry Creek about possible contract work, Dr. Mondragon learned that the District planned to terminate her employment before her contract ended on June 30, 2015.  She did not learn why she was being terminated.

On May 19, 2015, Mr. Kramarz called Cherry Creek to ask whether they planned to rehire or consult with Dr. Mondragon.  That same day, Cherry Creek School District's Educational Operations Leadership Team met to discuss various topics, including a potential contract for Dr. Mondragon.  Dr. Mondragon received text messages about the meeting, informing her that "folks were advised not to let schools hire [Dr. Mondragon's] company," and that "someone from Adams spoke to Sonia [Sonya McKenzie, Cherry Creek School District's Counsel]" and that the "Adams person said you were consulting [with an attorney.]"  Cherry Creek did not retain Dr. Mondragon's company.

On May 27, 2015, the District formally terminated Dr. Mondragon's employment without any further explanation.  After Dr. Mondragon filed a complaint with the Colorado Civil Rights Division, the District reported that she was terminated because of the (false) allegation she was having an affair and inappropriate behavior at the conference.  During the Colorado Civil Rights Division's investigation, Mr. Sanchez showed various community members and District employees the District's position statement and emails to the Colorado Civil

Rights Division.  These documents repeated the untrue allegations about Dr. Mondragon's extramarital affair.  When he was interviewing for a job with the Newark Unified School District Board, Mr. Sanchez again shared the untrue allegations about the affair, including at a public meeting.  Mr. Sanchez ultimately accepted the Newark job.

In April 2016, Larry Quintana, a member of the Adams Board until November 2015, told another former Adams employee that Mr. Sanchez was under investigation for his human resources practices.  He explained, "the thing that is really bothering the board is that 90 percent of the people that he gets rid of are women.  He forces them out."  He added that Mr. Sanchez "does not like women [who] voice their opinions" and "does not like women."  Mr. Quintana concluded that "I think they did [Dr. Mondragon] a real injustice and that is all I am going to say."

## II.  PROCEDURAL HISTORY

Dr. Mondragon filed a complaint in this Court against the defendants alleging that she was wrongfully stripped of her investigative duties, placed on administrative leave, and then terminated from her job as the District's Chief Academic and Equity Officer.  (Compl., ECF No. 1.)  Because Mr. Duran did not respond to the complaint, Dr. Mondragon filed a motion for default judgment against Mr. Duran and provided some supporting documentation.  (ECF Nos. 17, 22, 29.)  The clerk did not enter default because Dr. Mondragon has not yet filed proof she served the amended complaint on Mr. Duran.  (Clerk's Note, ECF No. 86.)

After Adams, Ms. Steel, and Mr. Sanchez filed motions to dismiss and Dr. Mondragon voluntarily dismissed some claims, Dr. Mondragon filed an amended

complaint.  (ECF No. 64.)  Dr. Mondragon and Ms. Steel then filed a stipulated

motion to dismiss the claims against Ms. Steel with prejudice (ECF No. 77), and I

granted that motion and denied Ms. Steel's pending motion to dismiss as moot (ECF

Nos. 78-79.)  In light of the amended complaint, I also dismissed as moot Adams's

motion to dismiss pursuant to Adams's request for clarification.  (ECF No. 68.)

Cherry Creek then filed an answer to the amended complaint (ECF No. 72), and

Adams and Mr. Sanchez filed motions to dismiss the amended complaint (ECF Nos.

70-71).

## III.  LEGAL STANDARD

Under Rule 12(b)(6), "[d]ismissal is appropriate only if the complaint, viewed

in the light most favorable to plaintiff, lacks enough facts to state a claim to relief

that is plausible on its face." *United States ex rel. Conner v. Salina Regional

Health Center*, 543 F.3d 1211, 1217 (10th Cir. 2008) (quotations marks omitted).  A

claim is plausible on its face "when the plaintiff pleads factual content that enables

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic

Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "The plausibility standard is not akin

to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully." *Id.*

Although plaintiffs need not provide "detailed factual allegations" to survive

a motion to dismiss, they must provide more than "labels and conclusions" or "a

formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555;

*see also Ashcroft*, 556 U.S. at 678 (explaining that a complaint will not suffice if it

offers "naked assertions devoid of further factual enhancement" (quotations and alterations omitted)). Furthermore, conclusory allegations are "not entitled to be assumed true." *Ashcroft*, 556 U.S. at 679.

A court may not dismiss a complaint merely because it appears unlikely or improbable that a plaintiff can prove the facts alleged or ultimately prevail on the merits. *Twombly*, 550 U.S. at 556. Instead, a court must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements. *Id.* If, in view of the facts alleged, it can be reasonably conceived that the plaintiff could establish a case that would entitle him to relief, the motion to dismiss should not be granted. *Id.* at 563 n.8.

Granting a motion to dismiss is a "harsh remedy" that should be "cautiously studied" to "effectuate the liberal rules of pleading" and "protect the interests of justice." *Idias v. City & Cnty. of Denver*, 1178 (10th Cir. 2009).

"[I]n general, a motion to dismiss should be converted to a summary judgment motion if a party submits, and the district court considers, materials outside the pleadings." *Prager v. LaFaver*, 180 F.3d 1185, 1188 (10th Cir. 1999). However, a court may properly consider additional documents if they are (1) "mentioned in the complaint," (2) "central to [the] claims," and (3) not challenged as inauthentic. *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013). I accordingly consider (1) the OCR report from the United States Department of Education (ECF No. 47-1) and (2) Dr. Mondragon's employment contract (ECF No. 71-2), which meet each of the elements above, in deciding this motion.

## IV.  MOTIONS TO DISMISS

### A.  Claim One: Denial of Equal Protection under 42 U.S.C. § 1983 against the District, Board, and Mr. Sanchez

In Claim One, Dr. Mondragon alleges the Board, District, and Mr. Sanchez violated her rights under 42 U.S.C. § 1983, which provides a remedy for the deprivation of rights under the Constitution or the laws of the United States by someone acting under the color of state law.  She alleges that the Board, District, and Mr. Sanchez deprived her of equal protection under the Fourteenth Amendment by placing her on investigatory leave, refusing to investigate her claims of employment discrimination, and terminating her.  Mr. Sanchez responds that he is entitled to qualified immunity and that in any event, Dr. Mondragon does not sufficiently allege a claim for relief based on an equal protection violation.  The District and Board argue that Dr. Mondragon has not sufficiently alleged a prima facie case of discrimination.  As I explain below, I conclude that Dr. Mondragon's complaint pleads facts showing a plausible claim that Mr. Sanchez, the Board, and the District violated her clearly established federal rights by firing her because she was a Hispanic woman.  I accordingly deny the motions to dismiss this claim.

### 1.  Mr. Sanchez

Mr. Sanchez argues this claim should be dismissed because he is entitled to qualified immunity.  Qualified immunity protects an executive official who violated the plaintiff's federally protected right so long as the official did not violate *clearly established* federal law.  Therefore, a Rule 12(b)(6) motion based on qualified immunity should be granted unless the complaint states facts showing a plausible claim that the defendant violated the plaintiff's clearly established federal right.

When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff, who must first establish that the defendant violated a constitutional right. *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If, on the other hand, a violation has been shown, the plaintiff must then show that the constitutional right was clearly established. *See id.*

Because qualified immunity is "immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 512 (1985), it should be resolved at the earliest possible stage of litigation, *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008). Nevertheless, a court deciding a qualified immunity question at the motion to dismiss stage must view all reasonable inferences in favor of the plaintiff and liberally construe the complaint, *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002), making resolving qualified immunity at this stage a "delicate matter that district courts should approach carefully." *Jacobs v. City of Chicago*, 215 F.3d 758, 765 (7th Cir. 2000).

### a.    Constitutional Violation

To state a claim under § 1983, a plaintiff must allege: (1) a deprivation of a federal right; and (2) that the person who deprived the plaintiff of that right acted under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). There is no dispute here regarding the latter element, so I address only whether Dr. Mondragon sufficiently alleged a deprivation of her federal right to equal protection under the

12

Fourteenth Amendment.  To make this determination, I also focus on whether Dr. Mondragon alleged what specific actions Mr. Sanchez took and how those actions harmed her.  *See Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007) (explaining that Rule 8 of the Federal Rules of Civil Procedure require a plaintiff "explain what each defendant did to him or her; when the defendant did it; how the defendant's action harmed him or her; and, what specific legal right the plaintiff believes the defendant violated").

The Equal Protection Clause guarantees that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'"  *Soskin v. Reinertson*, 353 F.3d 1242, 1247 (10th Cir. 2004) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

"The prima-facie case required to support a claim of intentional discrimination under the Equal Protection Clause varies based on the context and nature of the facts."  *Morman v. Campbell Cty. Mem'l Hosp.*, 632 F. App'x 927, 934 (10th Cir. 2015) (unpublished).  Here, the parties all cite the same elements: (1) the victim belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *See Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).  Under this standard, a plaintiff needs to prove she was treated differently than similarly-situated employees to prevail at trial.  *Village of Willowbrook v. Olech*,

528 U.S. 562, 564 (2000) (explaining that a plaintiff asserting an equal protection violation must show she was "intentionally treated differently from others similarly situated"); *Morman*, 632 F. App'x at 934.

However, "the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)). Nevertheless, the Tenth Circuit has recognized that the prima facie "elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Id.* at 1192. "[G]eneral assertions of discrimination . . . without any details whatsoever of events leading up to [the adverse employment action], are insufficient to survive a motion to dismiss." *Id.* at 1193. "While 'specific facts are not necessary,' some facts are." *Id.* (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (alteration omitted).

Mr. Sanchez does not dispute that as a Hispanic woman, Dr. Mondragon is a member of a protected class and that she suffered an adverse employment action when she was terminated. However, he asserts that she has not shown that her termination occurred under circumstances giving rise to an inference of discrimination because she has not shown that Mr. Sanchez "treated her differently than others 'similarly situated.'" (Sanchez's Mot. Dismiss at 7, ECF No. 70) (quoting *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998)).

Dr. Mondragon argues she was treated differently than a similarly-situated non-Hispanic male. Dr. Mondragon alleges she was fired in part for becoming

intoxicated after hours while traveling at a conference in Houston, Texas. (Am. Compl. ¶¶ 115-17, ECF No. 64.) She also alleges that a black male who was with her became so intoxicated that he vomited inside a bar while his subordinate simulated a sex act on him. (*Id.* ¶¶ 119-20.) She also included a picture that shows this incident. (*Id.* at 24.) According to Dr. Mondragon, the male, who was a principal at an Adams County school, received a raise and was not fired, even though Mr. Sanchez knew of his conduct when he terminated Dr. Mondragon. (*Id.* ¶ 123.) Apparently overlooking these allegations, Mr. Sanchez argues that Dr. Mondragon failed to allege that she was fired as a result of her intoxication. (Sanchez's Mot. Dismiss at 8, ECF No. 70.) I can quickly dismiss this argument as contrary to the allegations in the complaint, which I must accept as true.

Similarly, Mr. Sanchez argues that Dr. Mondragon must identify "non-Hispanic or nonfemale" employees "with a documented history of performance issues and employment problems" who were treated disparately in order to state a claim. (*Id.* at 7.) However, Dr. Mondragon alleges she is a "nationally known and respected expert in the area of education and equity," that her work "had an immediate and positive effect on the District," and that she received a raise and promotion during her short tenure with the District. (Am. Compl. ¶¶ 35-36, ECF No. 64). While Dr. Mondragon's complaint describes a meeting where her leadership style was questioned, she does not plead facts showing she had "performance issues or employment problems," as Mr. Sanchez suggests. Viewed in the light most favorable to Dr. Mondragon, she pleads facts demonstrating that

*despite* her positive impact on the district, her leadership was questioned.  I must therefore assume that Dr. Mondragon performed her job satisfactorily but was nevertheless terminated.

Mr. Sanchez also argues that because Dr. Mondragon was a member of the executive council and the black male was not, they are not "similarly situated." Individuals are considered "similarly-situated" when they "(1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005).  Dr. Mondragon does not allege whether she and the black male reported to the same supervisor, but argues in her response that they did.  (Response to Sanchez's Mot. Dismiss at 12, ECF No. 81.)  Because I must view all reasonable inferences in favor of the plaintiff and liberally construe the complaint, *Ruiz*, 299 F.3d at 1181, I assume that they did based on the fact that both were high-level employees in the same school district.

Mr. Sanchez also argues that Dr. Mondragon was a member of the executive council while the black male was not, meaning they were held to different standards of conduct.  (Sanchez's Mot. Dismiss at 8, ECF No. 70.)  Dr. Mondragon responds that the black male's conduct was more egregious because he vomited publicly and she did not.  (Response to Sanchez's Mot. Dismiss at 12, ECF No. 81.)  Moreover, Dr. Mondragon alleges that a subordinate of the black male witnessed his conduct.

(Am. Compl. ¶ 24, ECF No. 64.)  Based on the allegations in the complaint, I conclude that Dr. Mondragon plausibly alleged that she and the black male were similarly situated.  While their jobs were not identical, they both were high-level employees with significant oversight duties.  In making this determination, I do not determine that Dr. Mondragon and the black male were in fact similarly situated, only that the complaint sufficiently alleges that they were.

Finally, there are other allegations in the complaint that support an inference of discrimination.  Mr. Sanchez did not launch an investigation into Dr. Mondragon until after she gave him the results of her investigation into the discrimination complaints.  (*Id.* ¶ 54.)  Mr. Sanchez urged Dr. Mondragon to change the results of her investigation—results that were unflattering to Mr. Sanchez's administration.  (*Id.* ¶¶ 43, 48.)  A former school board member reported that Mr. Sanchez "does not like women," tends to fire women, and that "they did [Dr. Mondragon] a real injustice."  (*Id.* ¶¶ 130-31.)

I emphasize that at this stage, I must determine solely whether the facts in the complaint make out a plausible claim of discrimination against Mr. Sanchez.  I conclude that by describing the actions Mr. Sanchez took and pointing to facts suggesting discrimination, Dr. Mondragon has alleged a plausible claim that Mr. Sanchez denied her Fourteenth Amendment right to equal protection.

### b.   Clearly Established

Mr. Sanchez's argument that the law on this point is not clearly established is circular.  He argues that because he did not treat Dr. Mondragon disparately, there is no clearly established law on point.  But because I concluded that Dr.

Mondragon sufficiently alleged an equal protection violation, I can easily reject this argument, as I have little trouble concluding that the right to be free from discrimination on the basis of sex and race is clearly established. *See, e.g., Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150-51 (1970) ("Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his [or her] race . . . .").

I accordingly deny Mr. Sanchez's motion to dismiss this claim.

### 2.    District and Board

The District and Board, who are indistinct for liability purposes, *see Kentucky v. Graham*, 473 U.S. 159, 165 (1985), do not raise qualified immunity as a defense, but do argue that this claim should be dismissed for failure to state a claim.

The District and the Board make essentially the same argument regarding whether Dr. Mondragon sufficiently alleged that she and the black male were similarly situated that I rejected above.  They also argue that Dr. Mondragon engaged in an affair with a subordinate, unlike the black male, and was fired for that reason.  However, Dr. Mondragon alleges she was not engaged in an affair (Am. Compl. ¶¶ 64, 115), and I must accept that allegation as true.  Accepting the allegations in the complaint as true, I conclude that Dr. Mondragon sufficiently alleged that she and the black male were similarly situated.

I accordingly deny the District and Board's motion to dismiss this claim.

**B.     Claim Two: 42 U.S.C. § 1983 Conspiracy against Defendants Board, District, Mr. Sanchez, and Mr. Duran**

In Claim Two, Dr. Mondragon alleges that Mr. Sanchez and Mr. Duran

conspired to violate her civil rights and that the District and Board should be liable

for Mr. Sanchez's acts.  Mr. Sanchez responds that there was no conspiracy.  The

District and Board also argue there was no conspiracy and add that they cannot

properly be held accountable for Mr. Sanchez's conduct.  I agree that Dr. Mondragon

fails to sufficiently allege a conspiracy, warranting dismissal of this claim.

An allegation of a conspiracy does not itself state a claim for relief under

§ 1983; the plaintiff must also allege a constitutional deprivation.  *Dixon v. City of

Lawton, Okl.*, 898 F.2d 1443, 1449 (10th Cir. 1990).  To prove a conspiracy between

private parties and the state under § 1983, the plaintiff must show a joint

participation, agreement, or "meeting of the minds" to violate constitutional rights.

*Adickes*, 398 U.S. at 152; *Anaya v. Crossroads Managed Care Systems*, 195 F.3d

584, 586 (10th Cir. 1999).  "[A] plaintiff must allege specific facts showing an

agreement and concerted action amongst the defendants.  'Conclusory allegations of

conspiracy are insufficient to state a valid § 1983 claim.'"  *Tonkovich v. Kansas Bd.

of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (quoting *Hunt v. Bennett*, 17 F.3d

1263, 1266 (10th Cir. 1994)).

To establish a valid civil conspiracy claim, Dr. Mondragon must demonstrate

that the Board, District, and Mr. Duran agreed to deprive her of her constitutional

rights.  In this case, Dr. Mondragon alleges that they "conspired with one another to

investigate Dr. Mondragon, place her on administrative leave, terminate her

19

employment, preclude her from gaining employment and harming her personal and professional reputation." (Am. Compl. ¶ 160, ECF No. 64.) She further alleges that these actions violated her rights to due process, equal protection, freedom of speech and her liberty interests. (*Id.* ¶ 162.) However, because I conclude below Dr. Mondragon did not sufficiently allege freedom of speech or due process violations, her conspiracy claim based on those violations must also fail. The only remaining question is whether she sufficiently states a claim for conspiracy to violate her Fourteenth Amendment right to equal protection, given that I concluded above that Dr. Mondragon sufficiently alleged a Fourteenth Amendment violation.

As there will rarely be direct evidence of an agreement to conspire, a conspiracy often needs to be proven with circumstantial evidence. *Snell v. Tunnell*, 920 F.2d 673, 702 (10th Cir. 1990). However, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556. Dr. Mondragon's complaint includes no plausible allegations suggesting Mr. Duran and Mr. Sanchez conspired to deprive Dr. Mondragon of her equal protection rights. The allegations show that Mr. Duran met with Mr. Sanchez and discussed Dr. Mondragon and the allegations she was having an affair with a subordinate and the fact that she was going to be disciplined or even terminated. These allegations fall short of the type of evidence, even circumstantial evidence, necessary to show a "meeting of the minds" to deprive her of her right to equal protection. Mr. Duran may have been motivated by some type of animus toward Dr. Mondragon, but to sufficiently plead a conspiracy claim, Dr. Mondragon must show more. That she

fails to do.  Instead, she provides little more than a bare assertion of conspiracy and evidence of parallel conduct.  *See Twombly*, 550 U.S. at 556.

As for the conspiracy claim against the Board and District, Dr. Mondragon seeks to hold them accountable for Mr. Sanchez's conduct.  Because I conclude she failed to sufficiently allege that Mr. Sanchez participated in a conspiracy, she cannot sufficiently allege that the Board and District are liable for his participation. I accordingly grant the motions to dismiss this claim.

## C.   Claim Three: Denial of Due Process Liberty Interest against Defendants District, Board, and Mr. Sanchez

In Claim Three, Dr. Mondragon alleges the District, Board, and Mr. Sanchez deprived her of a due process liberty interest by making "public statements that impugned [her] good name, reputation, honor or integrity" while acting under the color of law.  (Am. Compl. ¶¶ 165-71, ECF No. 64).  The District and Board argue the claim is not sufficiently pleaded, and Mr. Sanchez argues he is entitled to qualified immunity on this claim.  I agree that Dr. Mondragon has not sufficiently pleaded a deprivation of a due process liberty interest.

Infringement on a constitutionally protected liberty in name and reputation interest occurs when: (1) statements by the employer impugn an employee's good name, reputation, honor, or integrity; (2) the statements are false; (3) the statements occur in the course of terminating the employee and forecloses other employment opportunities; and (4) the statements were published (i.e., disclosed publicly).  *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014).

However, even assuming Dr. Mondragon's liberty interest was infringed upon, she would not be able to sufficiently state a claim because she received a name-clearing hearing to vindicate her due process rights. *See id.* at 1213 ("When an employee's liberty interest is infringed upon, he must receive an adequate name-clearing hearing."). An adequate name-clearing hearing "gives the plaintiff an opportunity to hear and answer firsthand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation." *Id.* (quotation omitted). Here, the allegations in the complaint demonstrate that Dr. Mondragon was notified of the allegations against her and given the opportunity to respond to them in a meeting with Jack Kronser, the Acting Chief Director of Human Resources, and Yessica O'Conner, an executive assistant who took notes at the meeting. (Am. Compl. ¶¶ 80-88, ECF No. 64.) At the meeting, Dr. Mondragon was told that she "failed to conduct herself as a leader," was told about the allegations related to the Houston conference, and was told about the allegations she had an affair with a subordinate. (*Id.*) She also had the opportunity to discuss these allegations at the meeting. (*Id.*)

Accordingly, Dr. Mondragon does not state a plausible claim that the District, Board, and Mr. Sanchez deprived her of a due process liberty interest, and I need not engage in any further analysis regarding Mr. Sanchez's qualified immunity argument. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries

concerning qualified immunity."). I will therefore grant the motions to dismiss this claim.

**D.    Claim Four: 42 U.S.C. § 1983 Retaliation Against Dr. Mondragon for Freedom of Speech against the District, Board, and Mr. Sanchez**

In Claim Four, Dr. Mondragon alleges the District, Board, and Mr. Sanchez retaliated against her for exercising her free speech rights. She argues that the conclusions in her January 2015 report that administrators had "engaged in creating an atmosphere of distrust and conflict" and "implemented disproportionate measures against particular parents" were protected under the First Amendment. (Am. Compl. ¶¶ 172-81, ECF No. 64.) The Board and District argue that she has not pleaded sufficient facts supporting a First Amendment retaliation claim, and Mr. Sanchez also argues that he is entitled to qualified immunity. I agree that Dr. Mondragon has not sufficiently alleged a First Amendment retaliation claim.

As a public employee, Dr. Mondragon is protected by the First Amendment. *See Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006). However, speech made pursuant to her official duties is not protected. *See id.* at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

Dr. Mondragon does not dispute that she completed the report as part of her job with the District. (Am. Compl. ¶¶ 10-46, ECF No. 64). Nevertheless, Dr. Mondragon argues that because her position with the District was created by the OCR agreement, which prohibits retaliation, this Court should essentially craft an

exception to the *Garcetti* rule.  Dr. Mondragon insists that to conclude otherwise would "render the OCR Agreement hollow."  (Response to Sanchez's Mot. Dismiss at 18, ECF No. 81.)  I disagree.  It goes without saying that the OCR agreement did not create any substantive constitutional rights for Dr. Mondragon; it was an agreement between the District and OCR.  While the allegations in the complaint, if true, may well show the District violated the OCR agreement, that does not mean Dr. Mondragon states a First Amendment retaliation claim.

Accordingly, Dr. Mondragon has not stated a First Amendment retaliation claim.  In light of this conclusion, I need not delve further into Mr. Sanchez's qualified immunity argument.  *See Saucier*, 533 U.S. at 201.  I grant the motions to dismiss this claim.

### E.   Claim Five: National Origin, Ancestry, and Sex Discrimination Under Title VII and CADA by the District and Board

In Claim Five, Dr. Mondragon alleges that the District and Board discriminated against her under Title VII and CADA.  "Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin."  *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 825 (1976) (citing 42 U.S.C. §§ 2000e-2, 2000e-3).  Employment discrimination suits under § 1983, Title VII, and CADA are analyzed the same way.  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005); *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227 (10th Cir. 2007) ("'In disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII.' ").

Because I concluded above that Dr. Mondragon sufficiently alleged a claim under §

1983, *see* Section IV(A), she also sufficiently alleged a claim under Title VII and

CADA.  I therefore deny the motion to dismiss this claim.

**F.   Claim Six:  Retaliation Under Title VII and CADA against all Defendants**

In Claim Six, Dr. Mondragon alleges that the defendants retaliated against

her for participating in a discrimination investigation and opposing discriminatory

practices, in violation of Title VII and the CADA.  The Board and District do not

move for dismissal of this claim.  Dr. Mondragon has conceded that she "does not

have evidence and cannot allege that Defendant Kramarz knew of Plaintiff

Mondragon's discrimination and retaliation complaints," and indicated she planned

to voluntarily dismiss this claim against him.  (Resp. to Adams's Mot. Dismiss at 26,

ECF No. 82.)  I therefore limit my analysis below to whether Dr. Mondragon states

a claim against Mr. Sanchez.

CADA makes it unlawful for "any person, whether or not an employer" to

"discriminate against any person because such person has opposed any practice

made a discriminatory or an unfair employment practice" by the statute.  Colo. Rev.

Stat. § 24-34-402(e)(IV).  By contrast, Title VII imposes liability only on employers.

42 U.S.C. § 2000e-3(a).  As Dr. Mondragon concedes, only CADA can serve as a

basis for liability for Mr. Sanchez because he is not an employer.  (Resp. to

Sanchez's Mot. Dismiss at 23, ECF No. 81.)

However, apart from the difference in who can be held liable, Title VII and

CADA claims are subject to the same legal standards.  *Johnson v. Weld Cnty.*, 594

F.3d 1202, 1219 n.11 (10th Cir. 2010).  A plaintiff can establish retaliation under Title VII either by directly showing that retaliation played a motivating part in the employment decision (called a "mixed-motive" or direct theory) or indirectly by relying on the three-part *McDonnell Douglas* framework (called a "pretext" theory). *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1004 (10th Cir. 2011).  The *McDonnell Douglas* framework, which is the most common way to analyze a retaliation claim, requires a plaintiff establish a prima facie case by showing: "(1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1227 (10th Cir. 2008).

If a plaintiff makes that prima facie showing, the defendant must proffer a legitimate, nondiscriminatory reason for its conduct. *Id.*  The plaintiff then has the burden of demonstrating that the defendant's asserted reasons are pretextual. *Id.* Notably, at this early stage, a plaintiff does not have to specify whether the case arises under the mixed-motive or pretext theory. *Fye*, 516 F.3d at 1225 ("We emphasize that a plaintiff need not characterize her case as a mixed-motive or pretext case from the outset.").  She also does not need to prove a prima facie case, but the elements of a prima facie case inform whether she states a plausible claim for relief. *Khalik*, 671 F.3d at 1192.

In a mixed-motive case, a plaintiff must present evidence directly establishing that retaliation played a motivating part in the employment decision at

issue. *Fye*, 516 F.3d at 1226.  Here, Dr. Mondragon has not alleged any direct evidence of retaliation.  *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) ("Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.").

However, Dr. Mondragon has pleaded a plausible claim under the *McDonnell Douglas* framework.  It is undisputed that she complained of discrimination and investigated numerous allegations of racial discrimination.  It is also undisputed that she was fired.  Given the timing of the investigation into her—after she completed the investigation into discrimination and authored the report critical of school administration—she sufficiently pleaded a causal connection between her opposition to discrimination and her termination.  *See Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir. 1982) ("The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.").  In addition to this temporal proximity, other allegations in the complaint point toward retaliation: the district's history of discrimination, Mr. Sanchez's requests that Dr. Mondragon alter her conclusions, and his decision to inappropriately access her computer to alter her findings.

I accordingly deny Mr. Sanchez's motion to dismiss this claim.  I grant Mr. Kramarz's motion to dismiss this claim against him based on Dr. Mondragon's concession that she has not sufficiently alleged a claim against him.

**G.    Claim Seven:  Aiding and Abetting Discrimination in Violation of CADA against Defendants Sanchez, Kramarz, Duran, and Cherry Creek**

In Claim Seven, Dr. Mondragon alleges the defendants assisted the District in engaging in discriminatory and retaliatory acts against her in violation of CADA. CADA prohibits aiding and abetting any act the statute defines as discriminatory or unfair.  Colo. Rev. Stat. § 24-34-402(1)(e)(I).  As with her claim for retaliation in violation of Title VII and CADA (Claim Six), Dr. Mondragon reported she intends to dismiss this claim against Defendant Kramarz because she "does not have evidence and cannot allege that Defendant Kramarz knew of Plaintiff Mondragon's discrimination and retaliation complaints."  (Resp. to Adams's Mot. Dismiss at 26, ECF No. 82.)  Based on these statements, I dismiss this claim as to Mr. Kramarz.

However, because I concluded above that Dr. Mondragon sufficiently pleaded a retaliation claim under CADA, I must now determine whether she sufficiently pleaded an aiding and abetting claim against Mr. Sanchez.  CADA's prohibition against aiding and abetting discriminatory acts does not require the intent to discriminate by the aider or abettor.  *Colorado Civil Rights Comm'n v. Travelers Ins. Co.*, 759 P.2d 1358, 1369 (Colo. 1988).  Instead, it prohibits "conduct that assists others in their performance of prohibited acts."  *Id.*  The Colorado courts have concluded that offering and underwriting an insurance policy that excludes the costs associated with a normal pregnancy violate CADA, as does printing a discriminatory advertisement in a newspaper.  *Id.*  Mr. Sanchez argues that Dr. Mondragon fails to identify any "any patently discriminatory action Sanchez allegedly assisted."  (Sanchez's Mot. Dismiss at 17, ECF No. 70.)  Dr. Mondragon

responds that Mr. Sanchez's initiation of a surreptitious investigation against her and false allegations of an affair or other promiscuousness aided and abetted in her discriminatory and retaliatory termination by the District.  Viewing the allegations in the light most favorable to her, I agree.

I accordingly deny Mr. Sanchez's motion to dismiss this claim.  I grant Mr. Kramarz's motion to dismiss this claim based on Dr. Mondragon's concession that she did not adequately plead a claim against him.

## H.    Claim Eight: Defamation against Defendants Sanchez and Duran

In Claim Eight, Dr. Mondragon alleges that Mr. Sanchez defamed her by making "defamatory statements to community members and other school districts about Dr. Mondragon, particularly about her professional and personal reputation." (Am. Compl. ¶ 201, ECF No. 64.)

The elements of defamation are: (1) a defamatory statement about another, (2) published to a third party, (3) with the publisher's fault amounting to at least negligence, and (4) when a statement is not defamatory per se, the plaintiff must plead special damages.  *McIntyre v. Jones*, 194 P.3d 519, 523-24 (Colo. App. 2008). A statement that a person is engaging in an extramarital affair is defamatory per se.  *Gordon v. Boyles*, 99 P.3d 75, 79 (Colo. App. 2004).

The tort of defamation exists to compensate people "who have suffered harm to their reputations due to the careless or malicious communications of others." *McIntyre*, 194 P.3d at 524.  However, to protect the competing interest in free speech, there are important modifications to the elements of the defamation tort in some circumstances.  First, the Colorado Governmental Immunity Act protects

29

public employees like Mr. Sanchez from liability unless their conduct is "willful and wanton." Colo. Rev. Stat. § 24-10-118(2)(a). Therefore, to state a plausible claim against Mr. Sanchez, Dr. Mondragon must allege more than negligence: she must allege specific facts showing he "purposefully pursued a course of action or inaction that he or she considered would probably result in the harm" caused to Dr. Mondragon. *Schnurr v. Bd. of Cty. Comm'rs of Jefferson Cty.*, 189 F. Supp. 2d 1105, 1140 (D. Colo. 2001) (applying Colorado law).

Second, if a statement involves a matter of public concern or pertains to a public official or public figure, a plaintiff must prove the defendant "published the statement with actual malice—that is, with actual knowledge that the statement is false or with reckless disregard for whether the statement is true" and must establish actual damages even if the statement is defamatory per se. *McIntyre*, 194 P.3d at 524.

Mr. Sanchez argues that Dr. Mondragon is a public official. In *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966), the United States Supreme Court defined "public officials" as government employees "who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." In addition, their position must have "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Id.* at 86.

Mr. Sanchez's argument on this point is threadbare: it consists of one conclusory sentence: "[p]laintiff's position is accurately characterized as that of a public official" and citations to *Pierce v. St. Vrain Valley Sch. Dist. Re-1J*, 944 P.2d 646, 652 (Colo. App. 1997), *rev'd on other grounds*, 981 P.2d 600 (Colo. 1999) and *Hayes v. Smith*, 832 P.2d 1022, 1024 (Colo. App. 1991). (Sanchez's Mot. Dismiss at 19, ECF No. 70.) Neither of the cases Mr. Sanchez cites offers any compelling support for his position. In *Pierce*, the plaintiff, a school superintendent, conceded he was a limited purpose public figure "concerning his duties as superintendent and his resignation from that position." *Pierce*, 944 P.2d at 652. In *Hayes*, the plaintiff, a high school teacher, did not object to the public figure classification. *Hayes*, 832 P.2d at 1024. Given that the public figure issue was not decided by the courts in either case, *Pierce* and *Hayes* do not provide meaningful guidance as to whether Dr. Mondragon is a public official.

In light of the limited argument on this point, and the fact that whether a plaintiff is a public official can be a fact-intensive inquiry, I defer determining whether Dr. Mondragon is a public official at this early stage of the proceedings. Instead, I conclude that even if she is a public official, Dr. Mondragon adequately pleaded her defamation claim. Viewed in the light most favorable to Dr. Mondragon, the allegations here show that Mr. Sanchez told the Board and District he had extensive evidence that Dr. Mondragon had an extramarital affair with a subordinate, despite knowing he had no such evidence. He apologized to Mr. Duran "for anything that was going to hurt [his and Dr. Mondragon's] family financially,"

which suggests he knew his conduct was likely to harm Dr. Mondragon. (Am. Compl. ¶ 68, ECF No. 64.) These allegations are sufficient to state a plausible claim that Mr. Sanchez acted willfully and wantonly and with actual malice by "purposefully pursuing a course of action" that he knew was likely to result in negative employment consequences to Dr. Mondragon. Dr. Mondragon has also sufficiently pleaded actual damages by showing that she was terminated in part because of the affair allegations.

I thus deny Mr. Sanchez's motion to dismiss this claim.

## I.   Claim Nine:  Extreme and Outrageous Conduct against Defendants Sanchez and Duran

In Claim Nine, Dr. Mondragon alleges that Mr. Sanchez and Mr. Duran engaged in extreme and outrageous conduct in violation of Colorado law. The elements of extreme and outrageous conduct are: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in the conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the plaintiff incurred severe emotional distress which was caused by the defendant's conduct. *Destefano v. Grabrian*, 763 P.2d 275, 286 (Colo. 1988). "Outrageous conduct" is defined as conduct that is "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

Courts have recognized that discriminatory conduct can constitute extreme and outrageous conduct. *E.g., Donaldson v. Am. Banco Corp.*, *Donaldson v. Am. Banco Corp.*, 945 F. Supp. 1456 (D. Colo. 1996). However, discriminatory conduct,

even by a supervisor, may not rise to the level of extreme and outrageous conduct. For example, in *Donaldson* the court denied summary judgment on a Title VII employment discrimination claim, but also held the same conduct did not rise to the level of extreme and outrageous conduct. 945 F. Supp. at 1463-66 (denying summary judgment on Title VII claim as to all plaintiffs, but granting summary judgment on extreme and outrageous conduct claim as to one plaintiff). Where courts have concluded that discrimination and termination from employment constitute extreme and outrageous behavior, the conduct has been far more egregious than that alleged here. In *Mass v. Martin Marietta Corp.*, the plaintiff was subject to racially discriminatory jokes, offensive language including the term "dumb fucking nigger," racially charged cartoons, and other racially derogatory materials. 805 F. Supp. 1530, 1543-44 (D. Colo. 1992). By contrast, the Colorado Court of Appeals held that accusing a police officer of stabbing another officer, engaging in domestic violence, and having an affair was not extreme and outrageous conduct. *Gordon*, 99 P.3d at 78, 82. The allegations here are not nearly as egregious as those in *Mass*. They are more akin to the allegations in *Gordon*, which the court there held did not rise to the level of extreme and outrageous conduct. *Gordon*, 99 P.3d at 82.

I therefore conclude that the allegations here fail to state a plausible claim of extreme and outrageous conduct. I accordingly grant Mr. Sanchez's motion to dismiss this claim.

**J.    Claim Ten:  Tortious Interference with Prospective Business Relations against Defendant Kramarz**

In Claim Ten, Dr. Mondragon alleges that Mr. Kramarz intentionally and improperly interfered with her potential business relationship with Cherry Creek when he called the school on May 19, 2015, to inquire about Dr. Mondragon's potential employment there.  Mr. Kramarz argues he is entitled to absolute immunity on this claim because his statements were made in preparation for current or potential litigation.  While this case had not been filed at this time, Mr. Kramarz suggests the call related to potential damages if Dr. Mondragon ultimately filed suit.

In Colorado, an attorney's prelitigation statement is privileged and protected by absolute immunity if the statement is related to litigation and made in good faith.  *Begley v. Ireson*, ---P.3d---, 2017 2017 WL 117180, at *5 (Colo. App. January 12, 2017); *Merrick v. Burns, Wall, Smith & Mueller*, P.C., 43 P.3d 712, 714 (Colo. App. 2001) ("Communications preliminary to a judicial proceeding are protected by absolute immunity only if they have some relation to a proceeding that is actually contemplated in good faith.").  Here, Mr. Kramarz asserts absolute privilege and points to specific allegations in the complaint demonstrating the call was related to potential litigation.  Before Mr. Kramarz's call with Cherry Creek, Dr. Mondragon had hired an attorney, her attorney was in communication with the District, she had filed a charge with the Colorado Civil Rights Division (a prerequisite to filing this lawsuit), and her attorney had requested documents pursuant to the Colorado Open Records Act.  (Adams's Reply at 16-17, ECF No. 17.)  These allegations

34

demonstrate that Mr. Kramarz made this call in his capacity as the District's general counsel and that the call was related to potential litigation.  I thus grant the motion to dismiss this claim.

## K.  Claim Twelve:  Breach of Contract against Defendants District and Board

In Claim Twelve, Dr. Mondragon alleges she and the District and Board entered into a contract where she would work for the District until June 30, 2015, and they breached that contract by terminating her before then.  (Am. Compl. ¶¶ 219-23, ECF No. 64.)

The District and Board argue that Dr. Mondragon was an at-will employee based on language in her employment contract providing that "except to the extent provided otherwise by District Board of Education policy or law, he/she is an at-will employee of the District."  Under Colorado law, at-will employees can be terminated without cause or notice.  *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987).

Dr. Mondragon responds that the OCR agreement constitutes a "District Board of Education policy" that exempts her from at-will status.  The OCR agreement required the District to implement "new policies prohibiting discriminatory termination from employment, prohibited retaliation against persons who report alleged harassment or participated in related proceedings" and obligated the District to "investigate all formal and informal complaints of discrimination."  I fail to see how these requirements altered Dr. Mondragon's at-

will status, and Dr. Mondragon provides no convincing argument supporting her position.  I accordingly grant the motion to dismiss this claim.

## V.  MOTION FOR DEFAULT JUDGMENT

Because Mr. Duran has not defended himself in this action, Dr. Mondragon moved for default judgment against him under Federal Rule of Civil Procedure 55. (ECF No. 17.)  Rule 55(a) directs the clerk to enter default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  Rule 55(B)(2) authorizes a court to enter default judgment upon an application.

The clerk of this Court declined to enter default because Dr. Mondragon has not provided proof she served Mr. Duran with the amended complaint.  (Clerk's Note, ECF No. 86.)  As default has not yet entered, I deny the motions for default judgment without prejudice.

## VI.  CONCLUSION

For the reasons described above, I GRANT IN PART and DENY IN PART Mr. Sanchez's motion to dismiss the amended complaint.  (Sanchez's Mot. Dismiss, ECF No. 70.)  I GRANT IN PART and DENY IN PART Adams's Motion to Dismiss Amended Complaint.  (Adams's Mot. Dismiss, ECF No. 71.)  I DENY without prejudice Dr. Mondragon's motion for default judgment.  (ECF No. 17.)  I DENY as moot Mr. Sanchez's motion to dismiss the initial complaint.  (Sanchez's Mot. Dismiss, ECF No. 37).

To further summarize the status of this case, I describe below what claims remain against which defendants.  Notably, the claims against Mr. Duran still

remain pending because I have denied the motion for the default judgment without prejudice.  All the claims alleged against Cherry Creek remain pending because it has not moved for dismissal.  All the claims alleged against Ms. Steel no longer remain because the parties stipulated to dismissal.  Thus, the claims remaining are:

- Claim One remains pending against the District, Board, and Mr. Sanchez;

- Claim Two remains pending against Mr. Duran;

- Claim Five remains pending against the District and the Board;

- Claim Six remains pending against the District, the Board, Mr. Sanchez, Mr. Duran, and Cherry Creek;

- Claim Seven remains pending against Mr. Sanchez, Mr. Duran, and Cherry Creek;

- Claim Eight remains pending against Mr. Sanchez and Mr. Duran; and

- Claim Eleven remains pending against Mr. Duran.


Dated: February  24 , 2017 in Denver, Colorado.


BY THE COURT:

s/Lewis T. Babcock

LEWIS T.  BABCOCK